**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

RANDY BELTRAMEA,

        Defendant.

No. 13-CR-20-LRR

**ORDER**

---

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

II.    **RELEVANT PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . **1**

III.   **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

     A.    **Applicable Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
     B.    **Scope of Eighth Circuit Remand** . . . . . . . . . . . . . . . . . . . . . . **7**
     C.    **"Involved In" and "Traceable To"** . . . . . . . . . . . . . . . . . . . . . **9**
     D.    **Double Counting** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
     E.    **Excessive Fines Clause** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

## I. INTRODUCTION

The matters before the court are the government's forfeiture allegations against Defendant Randy Beltramea in the Second Superseding Indictment (docket no. 59).

## II. RELEVANT PROCEDURAL HISTORY

On October 24, 2013, the grand jury returned a sixteen-count Second Superseding Indictment (docket no. 59) charging Defendant with various counts of wire fraud, identity theft, money laundering, false statements and tax offenses. The Indictment further contained forfeiture allegations for the wire fraud counts (Counts 1-2), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and the money laundering counts (Counts

4-7), pursuant to 18 U.S.C. § 982(a)(1). On October 31, 2013, Defendant pled guilty to counts 1-4, 7, 8, 12 and 16 of the Second Superseding Indictment. *See* October 31, 2013 Minute Entry (docket no. 81) (reflecting Defendant's entry of his guilty pleas); October 31, 2013 Order (docket no. 84) (accepting Defendant's guilty pleas). On December 11, 2013, the government filed a "Motion for a Preliminary Order of Forfeiture" ("Motion for Preliminary Order") (docket no. 87), which listed seven pieces of real property and two monetary amounts that the government alleged were subject to forfeiture. Motion for Preliminary Order at 2-3. The real property listed by the government included three rental properties and land comprising Parcel A and Parcel B of a proposed land development called "Castlerock Estates" ("Castlerock"). *Id.* The Motion for Preliminary Order reflected that Defendant had consented to forfeiture of the real property and money described therein. *Id.* at 1. That same day, the court entered a Preliminary Order of Forfeiture (docket no. 88) as to all of the items listed in the Motion for Preliminary Order. The court based the Preliminary Order of Forfeiture "on the guilty plea entered on October 31, 2013 and the consent of the defendant." Preliminary Order of Forfeiture at 1. On April 4, 2014, the court sentenced Defendant to 111 months of imprisonment. *See* April 4, 2014 Minute Entry (docket no. 120). As part of the court's judgment, Defendant was ordered to forfeit the property listed in the Preliminary Order of Forfeiture. *See* Judgment (docket no. 121) at 7.

On April 14, 2014, Defendant timely filed a Notice of Appeal (docket no. 124) to the United States Court of Appeals for the Eighth Circuit. In its opinion, dated May 6, 2015, the Eighth Circuit affirmed Defendant's sentence but vacated the forfeiture because "[t]he government presented no factual allegations connecting the [properties allegedly subject to forfeiture] to any offense for which [Defendant] was convicted," finding that ordering forfeiture absent such factual nexus was plain error. Opinion of USCA (docket no. 220) at 8; *see also United States v. Beltramea*, 785 F.3d 287, 291 (8th Cir. 2015).

The case was remanded to the court for further proceedings on the forfeiture issue. *Beltramea*, 785 F.3d at 291.[1]

In light of the Eighth Circuit's opinion and judgment (docket no. 221), the court set a forfeiture hearing. *See* June 30, 2015 Order (docket no. 228). On July 16, 2015, the government filed a "Brief in Support of Forfeiture" ("Government Brief") (docket no. 229). That same day, Defendant filed a brief on the issue. *See* Defense Brief (docket no. 230). On July 30, 2015, the court held the forfeiture hearing. *See* July 30, 2015 Minute Entry (docket no. 232). The matter is fully submitted and ready for decision.

### III. RELEVANT FACTUAL BACKGROUND[2]

The wire fraud and money laundering offenses underlying the government's forfeiture allegations arise from Defendant's attempt to develop approximately eighty acres of land into a housing development called Castlerock. In 2000, Defendant funded his purchase of the Castlerock land with a $270,000 loan from "Community Savings Bank" ("CSB"). PSIR ¶ 12. In 2004, Defendant received a line of credit from CSB, in the amount of $500,000, to further fund Castlerock. PSIR ¶ 14. For both the loan and the line of credit, Castlerock served as collateral.[3] The CSB loan and line of credit were originally divided such that one funded Parcel A of Castlerock and the other funded Parcel

---

[1] The Eighth Circuit vacated and remanded "the forfeiture order." *Beltramea*, 785 F.3d at 291. The court understands this language to vacate both the Preliminary Order of Forfeiture and the final order of forfeiture included in the Judgment.

[2] The court finds the relevant facts from the "Final Presentence Investigation Report" ("PSIR") (docket no. 92); Defense Exhibits A (docket no. 231-1), D (docket no. 231-4) and E (docket no. 231-5), admitted at the forfeiture hearing; Government Exhibits 10, 28, 67, 70, 85-88, 90, 92, 93, 130 and 131 (docket nos. 233-37), admitted without objection at the forfeiture hearing; and witness testimony from the forfeiture hearing.

[3] Defendant further financed Castlerock and other investments through loans with U.S. Bank and Third Federal Savings Bank of Cleveland, Ohio. PSIR ¶¶ 13, 15. These loans were not secured by Castlerock.

B.  In 2009, Defendant had the CSB loan and line of credit refinanced and consolidated into a single loan secured by both parcels of Castlerock.  PSIR ¶ 25.

Defendant was an investment advisor from the 1990s until his license to sell securities was revoked in 2005.  PSIR ¶¶ 9, 11.  After 2005, in his efforts to develop Castlerock, Defendant contacted former investment clients to solicit funds for his use on the project.  *See, e.g.*, PSIR ¶¶ 17, 21, 22, 35, 40.  When soliciting funds from three former clients, Bob Wheeler and James and June Cook, Defendant fraudulently misrepresented the purpose for which he intended to use their funds.  Instead of describing his plans for Castlerock, Defendant falsely told Wheeler and the Cooks that he would use their funds to purchase and operate a series of Subway restaurants.[4]  PSIR ¶¶ 35, 40.  Defendant falsely stated that he currently owned a restaurant called Hot Harry's and that he and a partner were finalizing the purchase of multiple Subway restaurants.  PSIR ¶¶ 35, 40.  In fact, Defendant did not own Hot Harry's, Subway denied his application to purchase a Subway franchise and his efforts to buy a five percent stake in another Subway restaurant ultimately failed.  PSIR ¶¶ 27, 35, 38.  Based on Defendant's misrepresentations, on November 30, 2009, Wheeler wrote a $50,000 check payable to "Angelwing Equity" ("Angelwing"), which was Defendant's real estate investment company.  PSIR ¶ 35; Government Exhibit 70.  Likewise, on August 25, 2010, the Cooks wrote a $75,000 check payable to Angelwing.  PSIR ¶ 40; Government Exhibit 86.

Upon receiving the $50,000 check from Wheeler, Defendant deposited it into Angelwing's bank account, Government Exhibit 70, and then immediately wrote a

---

[4] The Cooks had previously given $115,000 to Defendant to invest in Castlerock, without Defendant's resort to fraudulent statements about Subway restaurants.  *See* PSIR ¶ 17 (describing a $65,000 payment by the Cooks on September 20, 2006); PSIR ¶ 36 (describing a $50,000 payment by the Cooks on April 10, 2010).  Defendant approached the Cooks about the false Subway venture only after the Cooks stated that they did not want to make additional real estate investments.  PSIR ¶ 40.

$44,831.10 check to Abode Construction. PSIR ¶ 35; Government Exhibit 130. The check satisfied an outstanding invoice for work that Abode Construction performed at Castlerock. Government Exhibit 130. The work billed on the Abode invoice spanned both Parcel A and Parcel B of Castlerock. Prior to his deposit of Wheeler's $50,000 check, Defendant lacked sufficient funds to cover the invoice. *Compare* Government Exhibit 67 (reflecting a $10,479.08 balance on November 30, 2009, before the deposit of Wheeler's $50,000), *with* Government Exhibit 130 (reflecting a $44,831.10 obligation to Abode Construction). Defendant's fraudulent inducement of $50,000 from Wheeler and his subsequent deposit of those funds and payment to Abode Construction provide the basis for the wire fraud and money laundering charges in Counts 1 and 4. *See* Second Superseding Indictment at 2-6.

On August 26, 2010, the day after Defendant received the $75,000 check from the Cooks, he deposited it into the Angelwing account. Government Exhibit 86. After the deposit, the account totaled $79,372.02. Government Exhibit 85. In the subsequent weeks, Defendant made two cash withdrawals from the Angelwing account, totaling $13,900, and ultimately closed the account on September 13, 2010 by withdrawing the remaining $65,472.02 as a cashier's check. PSIR ¶ 41; Government Exhibit 87; Government Exhibit 88. Defendant used the cashier's check to open a bank account in his mother's name on September 14, 2010. Government Exhibit 90; Government Exhibit 92. Using funds from the newly created account—composed of the remaining balance of the Cooks' $75,000 "investment"—Defendant made a $16,058 payment on the past-due consolidated CSB loan and a $16,303.50 payment on a past-due invoice from Abode Construction for work done on both Parcels A and B of Castlerock. *See* PSIR ¶ 41; Government Exhibit 93; Government Exhibit 131. Without the $75,000 from the Cooks, Defendant would have lacked sufficient funds to cover these payments. *Compare* Government Exhibit 85 (reflecting a $4,372.02 balance on August 23, 2010, before the

deposit of the Cooks' $75,000), *with* Government Exhibit 93 (reflecting a $16,058 payment on Defendant's bank loan), *and* Government Exhibit 131 (reflecting a $16,303.50 obligation to Abode Construction).  Defendant's fraudulent inducement of $75,000 from the Cooks and his subsequent transfer of those funds to the new checking account provide the basis for the wire fraud and money laundering charges in Counts 2 and 7.  *See* Second Superseding Indictment at 2-5, 7-8.

## IV.  ANALYSIS

In his appeal to the Eighth Circuit, Defendant conceded that the $125,000 monetary proceeds of the wire fraud offenses in Counts 1 and 2 shall be forfeited.  Brief and Addendum of Defendant-Appellant at *26-27, *Beltramea*, 785 F.3d 287 (No. 14-1899), 2014 WL 3827733.  Further, the government "has elected to forgo seeking forfeiture of any of the three rental properties identified in" its earlier forfeiture allegations. Government Brief at 6-7.  Accordingly, forfeiture of Castlerock as it relates to the money laundering offenses in Counts 4 and 7 is the sole remaining issue.

The government seeks forfeiture of the entirety of Castlerock.  *Id.* at 8.  Defendant resists forfeiture of Castlerock on numerous grounds, including the scope of the Eighth Circuit remand, the meaning of the terms "involved in" and "traceable to" in the relevant forfeiture statute and principles of double counting.  *See* Defense Brief at 3, 5-9, 17-18.[5]

---

[5] Defendant makes further arguments regarding various third-party claims to Castlerock.  *See* Defense Brief at 10-14 (regarding a claim made by Defendant's company, Randy L. Beltramea, L.L.C.); *id.* at 15-17 (regarding potential claims by a mortgagee bank, investors associated with Defendant and a former investment client of Defendant who sent him significant amounts of money for investment).  However, as the court and the parties clarified at the forfeiture hearing, the court will only address whether there is a sufficient factual nexus between Defendant's crimes and Castlerock to warrant forfeiture of that property.  It was on this issue that the Eighth Circuit remanded for further proceedings.  *See Beltramea*, 785 F.3d at 291.  Accordingly, any potential third-party claims to Castlerock are not presently before the court.

## A. Applicable Law

18 U.S.C. § 982(a)(1) provides that persons convicted of certain money laundering offenses (including violations of 18 U.S.C. §§ 1956 and 1957, charged in Counts 4 and 7) shall "forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). When the government seeks forfeiture, "the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). The government must establish this nexus by a preponderance of the evidence. *Beltramea*, 785 F.3d at 290. Therefore, the government must prove by a preponderance of the evidence either (1) that the property at issue was "involved in" an enumerated money laundering offense for which the defendant was convicted, or (2) that the property at issue is "traceable to" property involved in such an offense. *See, e.g.*, *id.*; *United States v. Hasson*, 333 F.3d 1264, 1279 (11th Cir. 2003).

## B. Scope of Eighth Circuit Remand

As an initial matter, Defendant argues that the Eighth Circuit's opinion expressly found that no factual nexus existed between the undeveloped portions of Castlerock and Defendant's crimes. Defense Brief at 5. Consistent with this interpretation, Defendant suggests that only Castlerock's 14.29 developed acres (out of 81.24 total acres) are colorably subject to forfeiture on remand. *See id.* Defendant points to the following language from the opinion in support of his interpretation:

> [T]he record regarding some of the Castlerock lots sought for forfeiture—26.33 acres of undeveloped land in Parcel B and 40.620 acres of undeveloped land in Parcel A (collectively "Undeveloped Lots")—appear[s] lacking in facts establishing a nexus between the Undeveloped Lots and the offense of conviction.

*Beltramea*, 785 F.3d at 291. Defendant construes this language as the Eighth Circuit's controlling determination that no factual nexus actually exists between Defendant's conduct

and the undeveloped portions of Castlerock and that, accordingly, the court is bound to that determination as the law of the case. *See* Defense Brief at 3 (citing *United States v. Wisecarver*, 644 F.3d 764, 770 (8th Cir. 2011)). The court disagrees.

Defendant is correct that "a district court has no authority to re-examine an issue settled by a higher court." *United States v. Castellanos*, 608 F.3d 1010, 1016 (8th Cir. 2010) (quoting *Bethea v. Levi Strauss & Co.*, 916 F.2d 453, 456 (8th Cir. 1990)). However, Defendant reads the Eighth Circuit's opinion too broadly. The Eighth Circuit did not conclude that no facts existed to establish the nexus required for forfeiture, but instead observed that no such facts appeared in the record. *See, e.g.*, *Beltramea*, 785 F.3d at 291 ("[I]t appears that there is no evidence *in the record* that the government met its burden to show a nexus between the property sought for forfeiture and an offense of conviction with respect to certain properties." (emphasis added)); *id.* ("[*T*]*he record* regarding some of the Castlerock lots . . . appear[s] lacking in facts establishing a nexus between the Undeveloped Lots and the offense of conviction." (emphasis added)). Indeed, because the government relied solely on Defendant's consent to the preliminary order of forfeiture, the Eighth Circuit observed that "[t]he government presented no factual allegations" on the issue. *Id.* Absent development of a record on the factual nexus issue, the Eighth Circuit cannot be understood to have "settled" the issue of whether such a factual nexus exists. Instead, the Eighth Circuit settled the issue of whether a factual nexus can be established based solely on a defendant's consent, answering in the negative. *Id.* ("[W]e do not believe a defendant's consent to forfeiture abrogates the requirement that a nexus exist between the property sought for forfeiture and the [offense of conviction].")

The Eighth Circuit "vacate[d] and remand[ed] the forfeiture order for proceedings consistent with [its] opinion." *Id.* Notably, the Eighth Circuit remanded "the forfeiture order," and not just the portion of the forfeiture order associated with the 14.29 developed acres of Castlerock. In the context of the Eighth Circuit's opinion, its mandate requires

the court to develop a factual record and revisit the relevant portions of the now-vacated forfeiture order to determine whether, and to what extent, forfeiture is warranted in this case. Aided by a factual record unavailable to the Eighth Circuit at the time of its opinion, the court will proceed to consider the government's forfeiture allegations as to the entirety of Castlerock.

### C. *"Involved In" and "Traceable To"*

The parties dispute whether, and to what extent, Castlerock was "involved in" or "traceable to" the money laundering offenses found in Counts 4 and 7, as required under § 982(a)(1). "Property 'involved in' an offense includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. Hawkey*, 148 F.3d 920, 927 (8th Cir. 1998) (quoting *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998)) (internal quotation marks and alterations omitted). "Property 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *Id.* at 928 (quoting *Bornfield*, 145 F.3d at 1135) (internal quotation marks omitted).

Defendant first argues that Count 4 is the only count capable of supporting forfeiture under § 982(a)(1). *See* Defense Brief at 6 n.4. Both counts reflect violations of money laundering statutes enumerated in § 982(a)(1). However, because Count 7 solely alleged Defendant's transfer of fraudulent funds into the bank account created in his mother's name—without any reference to payments benefitting Castlerock—Defendant contends that Count 7 "does not directly involve Castlerock." *Id.*; *see also* Second Superseding Indictment ¶¶ 13-14. On the other hand, the government argues that Count 7 weighs on the forfeiture of Castlerock because Defendant used the bank account in his mother's name to make a payment on the CSB loan and to satisfy an invoice for construction work improving Castlerock. Government Brief at 9-10. Defendant points out, however, that

the loan and construction payments were charged in separate counts (Counts 5 and 6) that the government dismissed, and impliedly argues that the forfeiture allegations previously attached to those dismissed counts cannot be transferred to another count to which Defendant pled guilty. *See* Defense Brief at 6 n.4; *see also* Second Superseding Indictment ¶¶ 9-12 (alleging the $16,058 loan payment as Count 5 and the $16,303.50 construction payment as Count 6); Judgment at 1 ("Counts 5, 6, 9, 10, 13, 14, and 15 of the Second Superseding Indictment are dismissed on the motion of the United States.").

Defendant is correct that the conduct underlying Count 7 "does not directly involve Castlerock" insofar as Castlerock was not "the money or other property being laundered . . . , any commissions or fees paid to the launderer, [or] any property used to facilitate the laundering offense." *Hawkey*, 148 F.3d at 927 (quoting *Bornfield*, 145 F.3d at 1135). However, that does not end the inquiry because § 982(a)(1) further provides for forfeiture of "any property *traceable to* such property [that is involved in the offense]." 18 U.S.C. § 982(a)(1) (emphasis added). The "traceable to" provision reaches any "property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *Id.* at 928 (quoting *Bornfield*, 145 F.3d at 1135). By way of illustration, if Defendant "[laundered] $10,000 and used $5,000 of those funds to purchase a motorcycle, the motorcycle is 'traceable to' the unlawful monetary transaction and is, therefore, subject to forfeiture." *Id.*

Defendant's circumstances are analogous to the illustration. In Count 7, he pled guilty to laundering $65,472.02, and the government has proved by a preponderance of the evidence that he used $32,361.50 of those funds to pay for improvements and the overdue CSB loan associated with Castlerock. *See* PSIR ¶ 41; Government Exhibit 93; Government Exhibit 131. As such, the Castlerock-related payments are "traceable to" the laundering scheme alleged in Count 7. Dismissal of charges corresponding to specific payments does not eliminate the traceability of those payments to the broader money

laundering conduct to which Defendant pled guilty in Count 7. Defendant cites no case to the contrary, and the court is aware of none. Accordingly, the court finds that the $32,361.50 in payments made toward Castlerock is traceable to Count 7. Further, Defendant concedes that the $44,831.10 in payments toward Castlerock alleged in Count 4 is traceable to that offense, Defense Brief at 6, and the record bears out that conclusion by a preponderance of the evidence. *See* PSIR ¶ 35; Government Exhibit 130.

Where, as here, payments toward a "real estate contract and improvements on the property" are made with laundered money, the property that benefitted from those payments is subject to forfeiture under § 982(a)(1). *See United States v. Myers*, 21 F.3d 826, 831 (8th Cir. 1994) (finding that real property was "involved in" money laundering and subject to forfeiture pursuant to § 982(a)(1) when the laundered money was spent toward the property); *accord.* In re *650 Fifth Ave. and Related Props.*, 777 F. Supp. 2d 529, 564 (S.D.N.Y. 2011) ("'[S]ome direct financial link between a defendant's money laundering and his real property must be shown before a court will order forfeiture of the property.' . . . [R]eal [p]roperty is involved in a money laundering offense if laundered funds are used . . . to pay for improvements." (citations omitted)); *United States v. Real Property and Premises*, 657 F. Supp. 2d 1060, 1069 (D. Minn. 2009) (interpreting the "traceable to" language in the civil forfeiture equivalent to § 982(a)(1) to leave "no serious dispute that, by spending allegedly tainted funds on renovations and property taxes for [a property], the property is 'traceable to' a money-laundering offense" (citing *Hawkey*, 148 F.3d at 927)). Therefore, it is not merely the payments toward Castlerock that are subject to forfeiture—Castlerock itself is subject to forfeiture as the object of those payments. Accordingly, because Castlerock is traceable to both Counts 4 and 7 via the series of payments made with laundered funds, the court will proceed to consider the extent to which Castlerock is subject to forfeiture.

Defendant argues that, because the amount of laundered money paid toward Castlerock is easily traceable, Castlerock is only forfeitable to the extent of those payments. Defense Brief at 7-9. The government argues that Castlerock is forfeitable in its entirety because it was treated as one singular piece of property, both by the consolidated CSB loan securing Castlerock in a single note and by Defendant's use of laundered funds to improve each of the purportedly separate parcels comprising Castlerock. Government Brief at 10-11.

Defendant's argument implies that, because the money paid toward Castlerock is traceable via checks paid and invoices satisfied, it necessarily follows that Castlerock is itself divisible in proportion to the payments made with laundered funds. According to this reasoning, forfeiture should extend only to the "tainted" portions of Castlerock. *See* Defense Brief at 9. Defendant cites to a series of cases wherein the government sought forfeiture of entire bank accounts in which defendants commingled laundered funds and legitimate funds. Defense Brief at 9-10 (citing In re *Rothstein*, 717 F.3d 1205 (11th Cir. 2013); *United States v. Puche*, 350 F.3d 1137 (11th Cir. 2003); *United States v. McGauley*, 279 F.3d 62 (1st Cir. 2002); *United States v. Stewart*, 185 F.3d 112 (3d Cir. 1999); *United States v. Tencer*, 107 F.3d 1120 (5th Cir. 1997)). From these cases, Defendant identifies three recurring threads: (1) "merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture," Defense Motion at 9 (quoting *Tencer*, 107 F.3d at 1134); (2) an account containing tainted and untainted funds is forfeitable in its entirety only if the government proves "the defendant . . . pooled the funds to disguise the nature and source of his scheme," Defense Motion at 9 (quoting *Tencer*, 107 F.3d at 1135); and (3) "forfeiture of the entirety of an account is not appropriate when the amount of laundered money traceable to that account can be readily determined." Defense Motion at 9 (citing *Stewart*, 185 F.3d at 129). Defendant acknowledges that Castlerock was funded by tainted and untainted money, like

the commingled accounts in the cases he cites. But Defendant further argues that he engaged in "no complicated transfers of money designed to disguise the source of the funds" and that the laundered money spent toward Castlerock is easily traceable. Defense Motion at 9. Therefore, treating Castlerock as equivalent to commingled bank accounts, it is subject to forfeiture only to the degree associated with the laundered funds.

The court finds Defendant's analogy to be flawed. It is true that the laundered money that benefitted Castlerock is traceable and divisible from Defendant's untainted funds. *See* Government Exhibit 70 ($50,000 check from Wheeler to Angelwing); Government Exhibit 67 (showing a $50,000 deposit into Angelwing account); Government Exhibit 130 ($44,831.10 check from Angelwing to Abode Construction for work done on Castlerock); *see also* Government Exhibit 86 ($75,000 check from the Cooks to Angelwing); Government Exhibit 85 (showing a $75,000 deposit into Angelwing account); Government Exhibit 87 (showing a $65,472.02 withdrawal to close the Angelwing account); Government Exhibit 92 (showing a $65,472.02 deposit into the bank account opened in Defendant's mother's name); Government Exhibit 93 ($16,058 check from the bank account in Defendant's mother's name paid toward the CSB loan); Government Exhibit 131 ($16,303.50 check from the bank account in Defendant's mother's name paid to Abode Construction for work done on Castlerock); *see also* Government Exhibit 28 (tracing various monetary transactions involving Defendant). However, as the court concluded above, Castlerock is subject to forfeiture due to Defendant's use of laundered funds to pay on the CSB loan and make improvements to the property. Thus, it is not simply the traceability and divisibility of the funds that are at issue, but the traceability and divisibility of Castlerock itself. And unlike situations where laundered funds are deposited into a commingled bank account such that each deposit of laundered funds can be divided from each deposit of untainted funds, there is no such mechanism for dividing portions of Castlerock funded by laundered funds from those funded by untainted funds. *See United*

*States v. Hull*, 606 F.3d 524, 529 (8th Cir. 2010) (discussing circuit precedent prohibiting district courts from subdividing real property subject to forfeiture).  Here, Defendant used laundered funds to make a $16,058 payment toward the consolidated loan financing Castlerock, which was secured by the entire property.  Likewise, testimony from the forfeiture hearing established that Defendant used laundered funds—vis-a-vis payment of the Abode Construction invoices—to make improvements upon both parcels making up the property.  Accordingly, the entire property is subject to forfeiture.

### D.  Double Counting

Defendant argues that, even if the court otherwise finds Castlerock subject to forfeiture on Counts 4 and 7, the forfeiture amounts to double and triple counting when combined with the additional forfeiture of the proceeds of Defendant's wire fraud, because the funds associated with the wire fraud were the same funds that were ultimately laundered and paid toward Castlerock.  *See* Defense Brief at 17.

To support this argument, Defendant relies on *United States v. Genova*, 333 F.3d 750 (7th Cir. 2003), wherein the Seventh Circuit interpreted the forfeiture provision of the "Racketeering Influenced and Corrupt Organizations Act" ("RICO").  *Genova*, 333 F.3d at 760-63.  In *Genova*, the Seventh Circuit addressed the issue of whether it was permissible to order the defendant to forfeit both the funds he received as unlawful kickbacks and his home, improvements on which were assumed to be partially paid for with unlawful funds.  *Id.* at 762.  The Seventh Circuit ultimately concluded that, while the unlawful kickbacks "could be *traced* to the home," ordering forfeiture of the tainted funds "once as cash and a second time as building materials [was] double counting" and was impermissible.  *Id.*  Defendant relies on this holding to argue that ordering forfeiture of "the $125,000 obtained from the Wheelers and the Cooks through fraud cannot be forfeited both as cash and as improvements to real property."  Defense Motion at 18.

Two observations warn against reading *Genova* as applicable to this case. First, the Seventh Circuit's analysis operated under the framework of RICO's forfeiture provision, rather than 18 U.S.C. § 982(a)(1). As such, even though it identified that the bribes could be "traced" to the home—consistent with the "traceable" language of § 982(a)(1)—the Seventh Circuit, in fact, sought to determine "how much of this value [the improvements to the home] represent[ed] 'proceeds' of crime." *Genova*, 333 F.3d at 762. Forfeiture of the "proceeds" of crime corresponds with RICO forfeiture, but not with criminal forfeiture under § 982(a)(1); likewise, forfeiture of property "traceable to" property involved in a crime corresponds with § 982(a)(1), but not with RICO forfeiture. *Compare* 18 U.S.C. § 1963(a)(3) (requiring forfeiture of, among other unlawful gains, "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity"), *with* 18 U.S.C. § 982(a)(1) (requiring forfeiture of "any property, real or personal, involved in such offense, or any property traceable to such property"). Given the mutual exclusion of the "proceeds" and "traceable" analyses, combined with the plain meanings of the terms—which imply a broader reach for something that is "traceable"—the court is reluctant to treat *Genova*'s holding as to the double counting of "proceeds" as persuasive authority for the instant issue of "traceability."

The second significant distinction between *Genova* and the instant case is that, in *Genova*, RICO forfeiture was warranted based solely on the defendant's acts of mail fraud. *See Genova*, 333 F.3d at 759 (stating that "[w]hether Genova's RICO conviction is tenable depends on the mail fraud convictions (and the predicate acts based on mail fraud)" after concluding that other alleged racketeering acts could not support a RICO conviction). Therefore, the double counting problem arose in a situation where the district court ordered multiple forfeitures based on a single fraudulent scheme. Here, however, the court does not double count because it does not order forfeiture of both cash and

Castlerock based solely on Defendant's fraudulent scheme. Instead, the court orders forfeiture of $125,000 in tainted funds based on Defendant's fraudulent scheme and orders forfeiture of Castlerock based on Defendant's money laundering.

In an unpublished opinion, the Second Circuit applied § 982(a)(1) to the same offenses on which Defendant was convicted, and it addressed a similar double counting argument:

> [The defendant] argues that the District Court erred in ordering the forfeiture of certain funds twice—once as proceeds of mail and wire fraud and once as property involved in money laundering. We disagree. Criminal forfeiture is a form of punishment. . . . [The defendant's] fraud and money laundering are two offenses impacting two distinct sets of victims. "The 'victims' of fraud counts are those persons who have lost money or property as a direct result of the fraud. The 'victim' of money laundering is, by contrast, ordinarily society at large." *United States v. Napoli*, 179 F.3d 1, 7 (2d Cir. 1999) (internal citation omitted). [The defendant] does not deny that he is subject to separate sentences for the fraud counts and the money laundering counts; consequently, the proceeds of those crimes are subject to separate orders of forfeiture.

*Schlesinger*, 261 Fed. App'x at 361. The court finds *Schlesinger* far more analogous to the instant case than *Genova* and finds its rationale more persuasive. The Second Circuit effectively concluded that no double counting exists when forfeiture is increased to account for multiple offenses causing distinct harms. This echoes the framework applicable to double counting in other contexts. *See, e.g.*, *United States v. Myers*, 598 F.3d 474, 476 (8th Cir. 2010) (finding double counting in the sentencing context only where factors "increase a defendant's punishment on account of a kind of harm that *has already been fully accounted for*" (emphasis added)). Because forfeiture is a form of punishment, and because each of Defendant's offenses caused a distinct harm to be accounted for, the court concludes that ordering forfeiture of both the defrauded funds and the real property paid

for and improved upon by laundering those funds does not amount to impermissible double counting.

### E. Excessive Fines Clause

Concluding that the entirety of Castlerock is subject to forfeiture does not end the forfeiture analysis. Forfeiture ordered pursuant to § 982(a)(1) must comport with the requirements of the Eighth Amendment's Excessive Fines Clause. *See United States v. Bajakajian*, 524 U.S. 321, 324 (1998).

The Excessive Fines Clause of the Eighth Amendment provides that "excessive fines [shall not be] imposed." U.S. Const. Amend. VIII. The Clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Bajakajian*, 524 U.S. at 328 (quoting *Austin v. United States*, 509 U.S. 602, 609-10 (1993)) (internal quotation marks omitted). "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334. As such, criminal forfeiture "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.*

In the Eighth Circuit, this analysis has two steps. First, "the defendant has the initial burden of making a prima facie showing of gross disproportionality." *United States v. Dodge Caravan Grand SE* ("*Dodge Caravan*"), 387 F.3d 758, 763 (8th Cir. 2004) (quoting *United States v. Premises Known as 6040 Wentworth Ave. S., Minneapolis, Hennepin Cty, Minn.* ("*6040 Wentworth Ave. S.*"), 123 F.3d 685, 688 (8th Cir. 1997)). Second, "[i]f the claimant can make this showing, the court considers whether the disproportionality 'reach[es] such a level of excessiveness that injustice [of] the punishment is more criminal than the crime.'" *Id.* (quoting *6040 Wentworth Ave. S.*, 123 F.3d at 688) (second alteration in original). In its disproportionality analysis, the court must consider "the extent and duration of the criminal conduct, the gravity of the offense weighed against

the severity of the criminal sanction, and the value of the property forfeited." *Id.* (quoting *United States v. Bieri*, 68 F.3d 232, 236 (8th Cir. 1995)). In addition, the court may consider other factors it deems relevant. *See id.* (listing other permissible factors to consider).

A 2010 appraisal of Castlerock determined its value to be $640,000. *See* Government Exhibit 10 at 3 (reflecting a $315,000 value for the residential lots plus a $325,000 value for the surrounding undeveloped land).[6] Counts 4 and 7 involved $110,303.12 in laundered funds. *See* Second Superseding Indictment ¶¶ 8, 14. Defendant spent $77,192.60 of those funds toward Castlerock. *See* Government Exhibits 93, 130, 131. The proportionality analysis compares the amount of forfeiture to "the gravity of the *offense*." *See Hull*, 606 F.3d at 529 (quoting *Bajakajian*, 524 U.S. at 334) (emphasis added). In other words, it is Defendant's money laundering—the offense Defendant committed—that is relevant to the proportionality analysis, and not the degree that the money laundering impacted the property forfeited. Therefore, the court will rely on the $110,303.12 in laundered money when assessing the proportionality of Defendant's offense to the forfeiture of Castlerock.

Regarding step one of the two-step proportionality analysis, the court notes that Defendant makes no prima facie showing of gross disproportionality insofar as he does not

---

[6] In Defendant's list of assets in the PSIR, Defendant self-reported Castlerock's value to be $432,000. PSIR ¶ 97 (referring to Castlerock as "Land - 80 acres"). Although the record is unclear, the court assumes without deciding that the discrepancy reflects the difference between the actual value of Castlerock ($640,000) and Defendant's equity in Castlerock ($432,000). In any event, because the lesser valuation would necessarily result in lesser potential disproportionality, the court's analysis remains the same under either valuation—$640,000 or $432,000.

The court also notes that, in documents provided to CSB in 2009, Defendant valued Castlerock at $6,634,295. *See* Government Exhibit 47 at 1. The court does not find this valuation to be credible, due to the extreme $6 million discrepancy between it and the formal appraisal conducted only one year later.

raise the issue in his brief.  *See generally* Defense Brief.  Because Defendant has failed to make a prima facie showing under step one, the court recognizes that he has not triggered step two of the analysis.  *See Dodge Caravan*, 387 F.3d at 763 (stating that the court considers disproportionality "[*i*]f the claimant can make [a prima facie] showing" (emphasis added)).  The failure to satisfy step one is likely sufficient to foreclose a finding that the forfeiture is grossly disproportional under the Excessive Fines Clause. Nevertheless, the court shall proceed to consider the issue under step two.

First, the extent and duration of Defendant's conduct weighs against a finding of gross proportionality.  Defendant's money laundering conduct spanned approximately one year: the conduct associated with Wheeler's funds occurred in November of 2009 and the conduct associated with the Cooks' funds occurred in August of 2010.  *See* PSIR ¶¶ 35, 41.  Defendant laundered over $100,000 defrauded from two different sources (Wheeler and the Cooks), using two separate bank accounts (the Angelwing account and the account created in his mother's name) to conduct transactions with the laundered funds.  *See id.* Defendant's conduct also reflects an escalation of his criminal behavior.  In 2009, Defendant laundered approximately $45,000 through his own investment company's account and made a single payment with the laundered funds to Abode Construction.  In 2010, he laundered a greater amount of money (approximately $65,000) through a newly created account (purportedly belonging to his mother) and made two payments with the laundered funds, one to Abode Construction and the other to CSB.

Second, balancing the severity of the sanction and the gravity of the offense further weighs against a finding of gross proportionality.  The Supreme Court has identified each of the following as relevant to the gravity of an offense: the relationship to other unlawful activity, the punishment authorized by law and the harm caused by the offense.  *See Bajakajian*, 524 U.S. at 337-39; *see also Dodge Caravan*, 387 F.3d at 763 (permitting inquiry into a defendant's culpability and other similar factors).  Here, Defendant obtained

the laundered funds through other unlawful activity, namely fraud, which he perpetrated by exploiting the trust of former clients from his prior career as an investment advisor. The maximum authorized fines for the money laundering violations are $250,000 for the conduct alleged in Count 4 and $500,000 for the conduct alleged in Count 7. 18 U.S.C. § 3571 (setting a $250,000 fine for individuals convicted of a felony offense, unless a specific fine is authorized by the statute defining the offense); 18 U.S.C. § 1956 (setting "a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater" for the offense charged in Count 4). Although statutory fines cannot trump the constitutional inquiry, forfeiture of the $640,000 property presumptively complies with the Excessive Fines Clause because it abides by the statutory scheme permitting a net fine of not more than $750,000—$250,000 for Count 4 and $500,000 for Count 7. *Cf. United States v. Aleff*, 772 F.3d 508, 513 (8th Cir. 2014) (finding a monetary sanction that was "about 4.3 times the actual damages" was not grossly disproportional where it was within the statutory limits); *Hull*, 606 F.3d at 529 ("Our court has said that if the value of forfeited property is within the permissible range of fines under the sentencing guidelines, then it is presumptively not excessive." (internal quotation marks and citation omitted)). Lastly, money laundering inflicts significant harm on society as a whole because it attempts to legitimize criminally obtained funds and impedes law enforcement. *See e.g.*, *United States v. Martin*, 320 F.3d 1223, 1227 (11th Cir. 2003). While the forfeiture of property valued at $640,000 is certainly a severe sanction, these relevant characteristics of Defendant's conduct establish that the severity of the sanction does not outweigh the gravity of the offense.

Third, the $640,000 value of Castlerock does not, in itself, favor a finding of gross disproportionality. While $640,000 is a substantial figure, so too is Defendant's offense a serious one, as noted above. Further, greater forfeitures and fines have been found not to be grossly disproportional where the gravity of the offense corresponds with the severity

of the sanction. *See, e.g.*, *Aleff*, 772 F.3d at 513 (finding a $1.3 million fine was not grossly disproportional); *United States v. Sigillito*, 899 F. Supp. 2d 850, 866-68 (E.D. Mo. 2012), *aff'd*, 759 F.3d 913 (8th Cir. 2014) (finding a $51,568,087.17 forfeiture was not grossly disproportional).

Thus, the court finds that Defendant has failed to make a prima facie showing of gross disproportionality. However, even if Defendant did make such a showing, the court is satisfied that forfeiture of Castlerock is not grossly disproportional to the gravity of the offense and, accordingly, does not run afoul of the Excessive Fines Clause of the Eighth Amendment.

## V. CONCLUSION

For the foregoing reasons, the court finds by a preponderance of the evidence that the requisite nexus has been established between Defendant's money laundering convictions, Counts 4 and 7, and the entirety of Castlerock. Additionally, the court finds that ordering forfeiture of Castlerock does not amount to double counting and does not violate the Excessive Fines Clause of the Eighth Amendment. Accordingly, the court **ORDERS** that Castlerock be forfeited.

**IT IS SO ORDERED.**

**DATED** this 3rd day of February, 2016.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA